IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-488-D

TRACY SEMPOWICH,                    )
                                    )
                    Plaintiff,      )
                                    )
          v.                        )          **ORDER**
                                    )
TACTILE SYSTEMS TECHNOLOGY,         )
INC., d/b/a Tactile Medical,        )
                                    )
                    Defendant.      )

On September 4, 2018, Tracy Sempowich ("Sempowich") filed a complaint against Tactile

Systems Technology, Inc. d/b/a Tactile Medical ("Tactile" or "defendant") alleging a disparate pay

claim under the Equal Pay Act ("EPA"), 29 U.S.C. § 216(b), sex discrimination, sex plus age

discrimination, and retaliation claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et

seq., and a wrongful discharge claim under North Carolina common law [D.E. 1-1]. On October 12,

2018, Tactile removed the action to this court [D.E. 1].

On October 10, 2019, Sempowich moved for sanctions under Federal Rule of Civil Procedure

37(e) or, in the alternative, moved to strike certain documents from evidence [D.E. 24] and filed a

memorandum and documents in support [D.E. 25, 26]. On October 29, 2019, Tactile responded in

opposition [D.E. 72–77]. On November 4, 2019, Sempowich replied [D.E. 84].

On October 21, 2019, Sempowich moved to exclude the opinion of Tactile's damages expert

Cowhey [D.E. 30] and filed a memorandum in support [D.E. 31]. On November 20, 2019, Tactile

responded in opposition [D.E. 99]. On December 6, 2019, Sempowich replied [D.E. 126].

On October 21, 2019, Sempowich moved for partial summary judgment concerning three

affirmative defenses [D.E. 34] and filed a memorandum and documents in support [D.E. 35–38].

On November 20, 2019, Tactile responded in opposition [D.E. 93–97]. On December 6, 2019,

Sempowich replied [D.E. 129, 130, 132, 133].

On October 21, 2019, Tactile moved for summary judgment on all claims [D.E. 41] and filed a memorandum and documents in support [D.E. 42, 43, 46–65, 143]. On November 20, 2019, Sempowich responded in opposition [D.E. 103–09, 111–13, 116]. On December 6, 2019, Tactile replied [D.E. 137–39].

On October 21, 2019, Tactile moved to exclude the expert report of Sempowich's expert Berry [D.E. 44] and filed a memorandum in support [D.E. 45]. On November 20, 2019, Sempowich responded in opposition [D.E. 87]. On December 6, 2019, Tactile replied [D.E. 136].

On November 20, 2019, Sempowich moved to strike Tactile's statement of material facts and certain documents [D.E. 90] and filed a memorandum in support [D.E. 91, 92]. On December 11, 2019, Tactile responded in opposition [D.E. 145]. On December 20, 2019, Sempowich replied [D.E. 149].

On November 21, 2019, Sempowich moved for leave to file exhibits [D.E. 115]. On December 11, 2019, Tactile responded [D.E. 146].

On December 6, 2019, Sempowich moved to strike Tactile's responsive statement of material facts to Sempowich's motion for partial summary judgment [D.E. 127] and filed a memorandum in support [D.E. 128]. On December 23, 2019, Tactile responded in opposition [D.E. 155]. On January 6, 2020, Sempowich replied [D.E. 159].

As explained below, the court grants Tactile's motion for summary judgment, grants Tactile's motion to strike the expert report of Sempowich's expert Berry, grants Sempowich's motion for leave to file exhibits, denies Sempowich's motions for sanctions or in the alternative to strike, to exclude opinion testimony of defense expert Cowhey, and to strike Tactile's statement of material facts, and dismisses as moot Sempowich's motion for partial summary judgment and motion to strike Tactile's responsive statement of material facts.

2

## I.

Tactile is based in Minneapolis, Minnesota, and manufactures compression medical devices for treatment of conditions including chronic swelling and wounds. See Mattys Decl. [D.E. 47-1] ¶¶ 5–6.[1] Gerald Mattys ("Mattys") has served as Tactile's Chief Executive Officer since 2005. Id. ¶ 3. Bob Folkes ("Folkes") has served as Tactile's Chief Operating Officer since February 2015. Before becoming COO, Folkes served as Tactile's Chief Financial Officer. See Folkes Decl. [D.E.

---

[1] In her response to Tactile's statement of material facts, Sempowich cites Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000), and argues that the court cannot credit "self-serving testimony of an interested witness for the movant." [D.E. 104] ¶¶ 9, 23, 36, 53, 54, 77, 82, 117, 119, 132, 133, 136, 137, 165, 208, 217, 218, 222, 228, 232, 233, 234, 238, 303, 345, 347, 348, 353, 379; see Reeves, 530 U.S. at 151 ("[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." (quotation omitted)). Sempowich also makes the same argument in her motion to strike Tactile's statement of material facts in support of its motion for summary judgment. See [D.E. 91] 18.

The court rejects Sempowich's argument. "Reeves states the noncontroversial position that witness testimony that the jury is not required to believe cannot be used to sustain a summary judgment decision, since the jury is not required to believe their testimony." Luh v. J.M. Huber Corp., 211 F. App'x 143, 146 (4th Cir. 2006) (per curiam) (unpublished); see Kingrey v. Quicken Loans, Inc., 629 F. App'x 509, 516 (4th Cir. 2015) (per curiam) (unpublished); Andrews v. Primus Telecomm. Grp., Inc., 107 F. App'x 301, 305 n.4 (4th Cir. 2004) (per curiam) (unpublished). In other words, Reeves does not "preclude consideration of uncontradicted testimony simply because it comes from a party in the lawsuit." Andrews, 107 F. App'x at 305 n.4. Other federal circuit courts also have rejected Sempowich's argument concerning Reeves. See Kidd v. Mando Am. Corp., 731 F.3d 1196, 1205 n.14 (11th Cir. 2013); Everett v. Cook Cty., 655 F.3d 723, 729 n.2 (7th Cir. 2011) (citing Traylor v. Brown, 295 F.3d 783, 791 (7th Cir. 2002)); E.E.O.C. v. Picture People, Inc., 684 F.3d 981, 989–90 (10th Cir. 2012); Ferguson v. Snow, 185 F. App'x 456, 465 (6th Cir. 2006) (per curiam) (unpublished); Robertson v. Alltel Info. Servs., 373 F.3d 647, 653 (5th Cir. 2004). Sempowich's argument also conflicts with the text of Rule 56. See Fed. R. Civ. P. 56(c); cf. E.D.N.C. Civ. R. 56.1(a). Thus, the court rejects Sempowich's arguments that Reeves precludes consideration of uncontradicted testimony of interested witnesses.

As for Sempowich's remaining arguments concerning Tactile's statement of material facts in her motion to strike, the court has carefully considered the arguments under the governing standard. See [D.E. 91] 4–28; Fed. R. Civ. P. 56(c), (e); E.D.N.C. Civ. R. 56.1(a). The court rejects as meritless Sempowich's arguments.

As for Sempowich's motion to strike late-filed exhibits to Tactile's statement of material facts, the court has carefully considered Sempowich's argument under the governing standard. See Fed. R. Civ. P. 16. The court denies as meritless Sempowich's motion to strike.

3

47-2] ¶ 2. At all points relevant to the litigation, Folkes had responsibility over Tactile's Human Resources including, inter alia, reviewing and signing employment offers and participating in termination of employment decisions. See id.; [D.E. 112-3] 4, 27. In December 2008, Brian Rishe ("Rishe") began as Tactile's Vice President of Sales. On January 4, 2018, Rishe became the Senior Vice President of Sales. See Rishe Decl. [D.E. 47-3] ¶ 2. Tactile's primary product is the Flexitouch system. The Flexitouch system "applies gradient pressure to move lymph fluid and reduce swelling and other complications" on an individual's trunk or limbs. See Mattys Decl. [D.E. 47-1] ¶¶ 8–9. This product accounts for most of the company's sales. See id. ¶ 10.

Tactile has divided the United States into multiple sales "areas" or "regions." Within any given area or region, Tactile has created smaller units called "districts" or "territories." See Mattys Decl. [D.E. 47-1] ¶ 13. Tactile realigns each sales unit based on its business needs and at its discretion. See id. ¶ 14; Rishe Dep. [D.E. 48-4] 43–44, 60–61. Within each area or region, Tactile has a hierarchy of sales positions. The area director is the highest ranking sales manager position. The regional sales manager is the next highest in rank. See Mattys Decl. [D.E. 47-1] ¶ 15. Both positions involved crafting sales strategies to meet Tactile's sales goals, and hiring, training, and leading a group of product specialists. See [D.E. 62-1, 62-2, 62-6]; Sempowich Dep. [D.E. 48-1] 20–22, 26–27; Rishe Dep. [D.E. 48-4] 51–52. Product specialists, along with district managers, are responsible for helping Tactile sell its products within the assigned area or region. See Rishe Decl. [D.E. 47-3] ¶ 11.

Sempowich, a female, was born on September 7, 1964. See [D.E. 65-8] 10. Sempowich has twice worked for Tactile. In 2006, Tactile hired her for the product specialist role in South Florida, a position Sempowich voluntarily left in 2009. See Sempowich Dep. [D.E. 48-1] 2–3. In 2010, Tactile rehired Sempowich as a product specialist. Christopher Miles ("Miles"), a regional sales manager for Tactile, recommend her for rehire. See id. at 8. Before her interview, Rishe told Sempowich that he was "not in favor" of rehiring her. Sempowich Decl. [D.E. 106-3] ¶ 8. On

September 13, 2010, Tactile hired Sempowich. Rishe decided to make the hire "with input" from Mattys and other senior Tactile executives. See Mattys Decl. [D.E. 47-1] ¶ 19; Folkes Decl. [D.E. 47-2] ¶ 6; Rishe Decl. [D.E. 47-3] ¶ 23; Watt Decl. [D.E. 47-5] ¶ 52. On October 3, 2011, Tactile promoted Sempowich to the senior product specialist position. Miles proposed promoting Sempowich to the position, and Rishe approved the promotion. See Rishe Decl. [D.E. 47-3] ¶ 27; Sempowich Dep. [D.E. 48-1] 8–9. In 2014, after expressing an interest in the regional sales manager job, Sempowich interviewed for the position with Rishe and several Tactile executive employees. See id. at 13–14. On April 1, 2014, Sempowich was promoted to regional sales manager of the Mid-Atlantic region. When Tactile promoted Sempowich, Tactile had four other regional sales managers. See id. at 9; Rishe Decl. [D.E. 47-3] ¶ 25.

Tactile created the Mid-Atlantic region by reassigning territories from the South region, which Miles led, and the North region, which Kyle Huss led. See Rishe Decl. [D.E. 47-3] ¶ 28; Sempowich Dep. [D.E. 48-1] 10–11. Tactile made several other reassignments of territory and personnel when Sempowich served as regional sales manager. For example, in July 2014, Tactile terminated Miles's employment as Southern region regional sales manager. On September 15, 2014, Tactile hired Greg Seeling ("Seeling") to replace Miles. See Rishe Dep. [D.E. 48-4] 18–19; [D.E. 65-8] 6, 9. In February 2015, Tactile created a "North Central Region" composed of territories within the Central region, and promoted Stephanie Toenges to regional sales manager for the new territory. See Rishe Dep. [D.E. 48-4] 59. At that time, the regional sales manager of the Central region was Adam Ferkinhoff ("Ferkinhoff"). See Rishe Decl. [D.E. 47-3] ¶ 25. Tactile later terminated Toenges's employment for a conduct violation at Tactile's national sales meeting. See [D.E. 62-5] 11; Rishe Dep. [D.E. 109-3] 59–62. On January 11, 2016, Tactile hired Karen Duprey ("Duprey") as regional sales manager of the Northeast region, replacing David Humiston. See Watt Decl. [D.E. 47-5] ¶ 11; [D.E. 65-8] 10. On December 2, 2016, Tactile terminated Duprey's employment, and realigned territories from the Northeast region. See Watt Decl. [D.E. 47-5] ¶ 11;

Duprey Dep. [D.E. 48-9] 3; [D.E. 65-8] 10. Specifically, in 2017, Tactile moved Boston, Maine, New Hampshire, and parts of Vermont from the Northeast region to the New York/New Jersey district under then-district manager Angela Neofostistos. See Rishe Decl. [D.E. 47-3] ¶ 30.

In addition, in 2017, Tactile moved parts of Maryland and Virginia from the Mid-Atlantic region to the Northeast region. See id. ¶ 31; Rishe Dep. [D.E. 48-4] 43–44. Tactile moved the territories to make the Northeast region "sustainable," i.e., to provide the Northeast region with a "sufficient sales volume and headcount to build on and remain its own region", and chose the territories based on "geographic and other considerations." Rishe Decl. [D.E. 47-3] ¶ 31. Before the move, in August 2016, Sempowich told Rishe that "most of the [Mid-Atlantic] Region's significant sales growth over" 2017 and 2018 "would likely come from these territories." Sempowich Decl. [D.E. 106-3] ¶ 50.

Tactile also created new positions within the company during Sempowich's employment. On February 1, 2016, Tactile created the area director position. See Rishe Dep. [D.E. 48-4] 49; [D.E. 65-8] 6. Tactile's first employee to hold the position was Jackie Gorsham ("Gorsham"). See Folkes Dep. [D.E. 48-3] 5; Rishe Dep. [D.E. 48-4] 49–50. On June 1, 2017, Ferkinhoff became Tactile's second area director. See Rishe Dep. [D.E. 48-4] 14; [D.E. 65-8] 6. Rishe supported and recommended Ferkinhoff's promotion to area director. See Rishe Dep. [D.E. 109-3] 41. As area director, Ferkinhoff's responsibilities included the Central region and the North Central region. See id. at 64. Before the North Central region moved to Ferkinhoff's responsibility, Stephanie Toenges was regional sales manager in the region. See id. at 59–60. Around the time Rishe recommended Ferkinhoff for the area director position, Seeling approached Rishe about a potential promotion to that role and other roles within Tactile. See Rishe Dep. [D.E. 109-3] 65. At various times, other regional sales managers, including Sempowich, expressed an interest in the area director role. See Mattys Dep. [D.E. 48-1] 28.

6

During Sempowich's tenure, Tactile's annual revenues grew yearly by 29% to 34%. See Mattys Decl. [D.E. 47-1] ¶ 2; Mattys Dep. [D.E. 48-2] 8. The Mid-Atlantic region also met the revenue goals Tactile set for it. See Rishe Dep. [D.E. 48-4] 9; [D.E. 62-11, 62-12]. Sempowich received the "Regional Sales Leadership Award" for exceeding her revenue plan in 2016, 2017, and January 2018 at Tactile's national sales meeting. See Sempowich Decl. [D.E. 106-3] ¶¶ 77–78; Rishe Dep. [D.E. 109-3] 11. Additionally, in 2015, Tactile rated Sempowich's overall performance as a "key contributor" (the third-highest rating out of six total rating categories), and in 2016, rated her a "major contributor" (the second-higest rating). See [D.E. 62-10] 3; [D.E. 62-12] 2. Seeling, the Southern regional sales manager, received a "contributor" rating in 2015 (the fourth-highest rating), and a "key contributor" rating in 2016. See [D.E. 107-8, 107-15].

From 2015 to 2017, Rishe believed that the Mid-Atlantic region, under Sempowich's leadership, had high levels of employee turnover and low levels of professional development. See Rishe Decl. [D.E. 47-3] ¶ 35. As for employee hiring, in November 2014, Tactile created a manager of sales recruitment position to help Tactile hire employees "in a timely, expeditious manner." Carter Dep. [D.E. 110-6] 3; see Rishe Dep. [D.E. 109-3] 47. The manager worked with external recruiters to find candidates for employment, reviewed resumés, administered personality assessments, conducted phone screenings, and then sent candidates to management for Tactile's "hiring process." Carter Dep. [D.E. 110-6] 3–4. Regional sales managers could not hire or terminate Tactile employees without Rishe's approval. See Rishe Dep. [D.E. 48-4] 28.

In Sempowich's 2015 performance review, Rishe stated that "[t]he biggest challenge in 2015 was . . . turnover," and that with several reassignments of territory and personnel, "[t]he challenge of 2016 [will be] education and training as new hires struggle to better the numbers produced by previous top performers." [D.E. 62-12] 3–4. In early 2016, Tactile decided to give Dharmini Desai ("Desai"), a Washington, D.C., product specialist under Sempowich, two associate product specialist positions. See Rishe Decl. [D.E. 47-3] ¶ 37; Sempowich Dep. [D.E. 48-1] 29–30. Tactile hired

7

candidates to fill the associate product specialist positions on September 26 and November 1, 2016. See Rishe Decl. [D.E. 47-3] ¶ 37; Watt Decl. [D.E. 47-5] ¶ 17; [D.E. 62-13] 3. Additionally, Tactile terminated the employment of three Mid-Atlantic region employees in September and October 2016. See Watt Decl. [D.E. 47-5] ¶¶ 18–23.

Sempowich's 2016 performance review, under the heading "2017 – Continued Development", stated:

> [w]ork with the VP of Sales [Rishe] to map out the growth plans for key personnel which will insure their retention, provide for succession and accommodate our explosive growth[;] Train and develop top talent for growth to the next level: District Management – Dharmini Desai[; and] Senior Sales Specialist – Ryan Price, Katie Hill and Carrie Anderburg[;] Strengthen Specialist Coaching and Leadership Skills resulting in increased productivity and more rapid promotion of Associates[;] Reduce turnover in ranks to below company averages.

[D.E. 62-15]; see Sempowich Dep. [D.E. 48-1] 40, 41, 44–46. On January 5, 2017, Rishe distributed a quota plan to Sempowich. See Rishe Decl. [D.E. 47-3] ¶ 39; Sempowich Dep. [D.E. 48-1] 39; [D.E. 63-1]. The plan called for an increase in headcount in the Mid-Atlantic region to 18 employees (i.e., adding three employees) by the end of 2017. See Rishe Decl. [D.E. 47-3] ¶¶ 44–45; Sempowich Dep. [D.E. 48-1] 39. Sempowich drafted a business plan for the third quarter of 2017. See Sempowich Dep. [D.E. 48-1] 57–58, 60; [D.E. 63-5]. Under the heading "Territory Overview", Sempowich wrote:

> 2017 has brought many challenges to [the Mid-Atlantic] region in different territories, but still has made significant strides and successes along the way. Our biggest hurtle [sic] has been headcount and the ability for expansion to enhance significant growth. This is the only tenured region that has not maximized expansion opportunities or had an increase of territory. With the combination of minimal headcount [in] DC, payer issues, hiring for lost territory in 2017, it was a perfect storm for a region that shows significant talent and drive to over[-]achieve.

[D.E. 63-5] 2. As for employee hiring in Washington, D.C., Sempowich noted that Desai was "[d]own 2 headcount," indicating two open positions on Desai's team. Id. at 3; see Sempowich Dep. [D.E. 48-1] 48–49, 61.

8

On August 3, 2017, Rishe emailed Sempowich to schedule a meeting with Sempowich, Julie Carter (an outside recruiter, and later Tactile's manager of sales recruitment), and Judy Bath (Tactile's current manager of sales recruitment) to discuss, "What can be done to improve the quality and quantity of candidate flow to the DC market[?]" [D.E. 63-4]; see Sempowich Dep. [D.E. 48-1] 53; Rishe Dep. [D.E. 48-4] 54; Carter Dep. [D.E. 48-5] 10–11. They discussed certain strategies to assist recruiting in the Washington, D.C., market including increasing the number of recruiters, increasing the fee paid to external recruiters, and considering candidates with scores on Tactile's personality test below Tactile's threshold. After this discussion, Tactile implemented some of the strategies identified. See Rishe Decl. [D.E. 47-3] ¶ 48; Sempowich Dep. [D.E. 48-1] 54–55; Rishe Dep. [D.E. 48-4] 54; Carter Dep. [D.E. 48-5] 12–13. In August 2017, Tactile adopted a new compensation plan for associates that allowed them to receive incentive-based compensation in the first full month of employment, rather than after three months of employment. See Carter Dep. [D.E. 48-5] 14–15.

The Mid-Atlantic region's total headcount goal for 2017 was not met, which Rishe believed was "[d]ue to turnover and slow hiring." Rishe Decl. [D.E. 47-3] ¶ 46; see Watt Decl. [D.E. 47-5] ¶ 38. Additionally, seven employees left the Mid-Atlantic region in 2017. Three were involuntarily terminated, one voluntarily resigned, one voluntarily transferred, and two voluntarily resigned but were later rehired in the region. See Watt Decl. [D.E. 47-5] ¶¶ 28–36.

On September 27, 2017, Rishe emailed Sempowich to discuss sales growth in the Mid-Atlantic region. See [D.E. 63-8]. In the email, Rishe stated that "nowhere do we have a bigger gap to close than in the Mid-Atlantic where [year-to-date] growth in [Flexitouch order completes] is currently running at 23%." Id.[2] An "order complete" occurs when Tactile determines that it has all

---

[2] As discussed below, the court denies Sempowich's motion for sanctions or, in the alternative, motion in limine concerning two spreadsheets containing the statistics recounted in this paragraph.

paperwork concerning a customer's payment for Tactile's product. See Rishe Dep. [D.E. 48-4] 5. Additionally, Tactile increased the Mid-Atlantic sales quota in 2017 from its 2016 quota by 22%, the smallest increase of any of Tactile's regions. See [D.E. 64-12]. Tactile establishes sales quotas for each territory based on, inter alia, payer environment in the territory, past performance of the sales representative, and the budget based on head count. See Rishe Dep. [D.E. 48-4] 33–34. The region or area's quota total is based on the sum total of the quotas for territories in that region. See id. at 32. Tactile establishes the annual sales quotas for any given year in the last three months of the prior year. See id. at 31. Rishe drafts the territory-level quotas based on Tactile's regional sales quotas. Tactile then approves Rishe's territory-level quotas. See Folkes Dep. [D.E. 48-3] 7–8. In 2017, Sempowich requested and Rishe granted a 14.8% downward adjustment in quotas. See Sempowich Dep. [D.E. 48-1] 63–64; [D.E. 63-7]. The Mid-Atlantic downward quota adjustment was the largest across all of Tactile's regions. See [D.E. 64-12]. The Southern Region, led by Seeling, had a 43% increase in Flexitouch order completes, a 2017 quota increase of 44%, and a downward quota adjustment of 5.3%. See id.; [D.E. 63-8].

Rishe believed that, by fall 2017, the Mid-Atlantic region "was lagging in a number of year-over-year growth metrics," and that this was due to Sempowich's efforts in "recruitment, retention and development of talent." Rishe Decl. [D.E. 47-3] ¶¶ 56–57. Tactile evaluated year-over-year growth and performance statistics in its annual company planning processes and discussed the statistics with investors. Tactile believed that year-over-year growth was an important business metric. See Rishe Decl. [D.E. 47-3] ¶ 4; Mattys Dep. [D.E. 48-2] 6–7, 51. In the fall 2017 budgeting meetings, Rishe discussed reassigning the Mid-Atlantic region. Rishe also discussed promoting Seeling to area director or another position within Tactile, but the discussions were not specific. See Rishe Dep. [D.E. 109-3] 66–67; Folkes Dep. [D.E. 139-7] 7. According to Mattys, Seeling's potential promotion and the reassignment of the Mid-Atlantic territories were "two separate things . . . . [Seeling] could [have been] promoted to an area director without taking over

10

the Mid-Atlantic region." Mattys Dep. [D.E. 139-10] 12–13.

On October 12, 2017, Rishe sent Seeling an email stating: "17%? This is not demonstrating any mastery of the business. You are squandering your opportunity for promotion buddy. I can't do much on your behalf with these numbers." [D.E. 107-7] 4. On the same date, Seeling responded. After expressing his disappointment in Rishe's email and emphasizing his team's ability to hit its goals over the past two years, Seeling stated: "The most disappointing part is the comment about promotion. If me getting promoted is solely based on any one month or one week within one month, then you'll have to do what you have to do. And if it doesn't go the way I would like, then I'll have to do what I have to do, but I'll remain confident that the right things will happen in the end." Id. On October 13, 2017, Rishe responded. After discussing Tactile's business climate in the Southeast region, Rishe stated: "As to the promotion, I think have [sic] an obligation to call out issues especially when they are impeding your progress towards a goal that you are expecting to achieve. . . . My urgency is all about insuring [sic] that we a) get out of this depressed and slow recovery cycle as fast as possible – because this has to be our best quarter – and b) are constantly raising the bar so that the South mirrors the productivity in the more productive Regions like the South [sic] and West. . . . Greg, I see no shortage of talent to correct this. I just don't see an appreciation of the impact of time and an urgency to overcome it." Id. at 3. Rishe forwarded the emails to Folkes and Mattys.

In January 2018, Rishe recommended to Mattys removing Sempowich from the regional sales manager position in the Mid-Atlantic region. See Rishe Decl. [D.E. 47-3] ¶ 58; Mattys Dep. [D.E. 48-2] 24–25. Rishe and Mattys wanted Sempowich to remain a Tactile employee. See Mattys Dep. [D.E. 48-2] 31; Rishe Dep. [D.E. 48-4] 71. On January 30, 2018, Rishe and Mattys discussed a position in Tactile's head and neck business and reviewed a job description Rishe drafted for the position. See Mattys Dep. [D.E. 48-2] 34–37. This position involved Tactile's latest business innovation concerning a product that treated head and neck lymphedema. See Mattys Decl. [D.E. 47-1] ¶¶ 25–26. Rishe and Mattys believed Sempowich was "perfect" for the position. Specifically,

11

Mattys thought Sempowich's sales relationships, credibility, and presence in certain territories fit the head and neck manager position. See Mattys Dep. [D.E. 48-2] 45, 48–50; [D.E. 63-13]. Folkes approved offering Sempowich the position. See Folkes Decl. [D.E. 47-2] ¶ 9; Folkes Dep. [D.E. 48-3] 15–16.

On February 12, 2018, Rishe called Sempowich to tell her that Tactile reassigned the Mid-Atlantic Region to Seeling and was offering her the head and neck manager position. See Sempowich Dep. [D.E. 48-1] 65–66; Rishe Dep. [D.E. 48-4] 68. During the call, Rishe also told Sempowich that Tactile was promoting Seeling to the area director position on March 1, 2018. See Sempowich Decl. [D.E. 106-3] ¶ 168. After speaking with Sempowich, Rishe sent her a job description for the head and neck manager position. See Sempowich Dep. [D.E. 48-1] 67–68; [D.E. 63-15].

About one week later, Sempowich and Rishe spoke on the phone. Sempowich secretly recorded the conversation. See Sempowich Dep. [D.E. 48-1] 69–72; [D.E. 64-7] (transcript). During the call, Sempowich stated that she viewed the head and neck position "more like a sales job with a manager title" because, unlike the regional sales manager position, the head and neck position was a "nondirect report role." [D.E. 64-7] 5. Rishe responded that the position "gets you more than a sales job. More than a sales job with a manager title, at least that's our intention. You know how important this head and neck business is to [Tactile] and, in particular, to the investors, because we've talked about it before." Id. Rishe also noted that the head and neck position was strategically important to Tactile. See id. at 5–6. Sempowich responded that she was "trying to figure out how [she is] going to navigate being a manager in a different division, a different opportunity, of what that looks like." Id. at 12. Sempowich added, "I'm just kind of struggling with, you what [sic], I couldn't grow the way, you know, I think that you're measuring me on from last year with the fact that there was a lot of things that were out of my control from a business perspective, but we still navigated a really good finish." Id. Rishe responded, "[N]o one is going to say anything . . . [but]

12

positive things about your performance. We want this to be viewed completely as another assignment that needs to be done in the organization . . . one which you're strategically suited for, have unique qualities for . . . ." Id. Rishe went on to say that "in bigger companies people typically wind up in assignments for three to four years and then they move on to the next assignment. Even at the senior levels. It's to give people the opportunity to have a more well-rounded experience in the commercial side of the business, through all the business in its entirety." Id. at 14–15. Earlier in the call, Rishe addressed compensation for the head and neck position. See id. at 9–12; Sempowich Dep. [D.E. 48-1] 76. Rishe stated that Sempowich's compensation would be "commensurate with a region manager," indicated her base pay would be the same, and that her incentive compensation "will pay out the same . . . and have upside" and would be "based on [management by objectives.]" [D.E. 64-7] 9–10.

On February 22, 2018, Rishe emailed Mattys's administrative assistant. In the email, Rishe stated that Seeling would take responsibility for the Mid-Atlantic region and become area director on March 1, 2018. See [D.E. 106-7]. On the same date, Sempowich filed a written complaint with Tactile's Human Resources department. See [D.E. 46-3]; Watt Decl. [D.E. 47-5] ¶ 39; Sempowich Dep. [D.E. 48-1] 97. In the complaint, Sempowich stated that she was "treated unfairly and discriminated against" due to her age and sex, and noted several events that she stated supported her belief. See [D.E. 46-3] 4–5. During this litigation, Sempowich submitted testimony from female counterparts at Tactile of alleged unfair treatment. For example, Duprey testified that females at Tactile "typically" were not asked to be part of "meetings," and that male counterparts dictated business decisions to her that she "was asked to follow." Duprey Dep. [D.E. 108-5] 8. Toenges testified that, while at a restaurant for a business dinner, she was seated next to Mattys when Seeling asked her to move. See Toenges Dep. [D.E. 107-3] 7–8. In addition, Sempowich testified that she asked Rishe for an opportunity to lead a training session, but Rishe told her to discuss co-leading a session with either Seeling or Ferkinhoff. See Sempowich Decl. [D.E. 106-3] ¶¶ 92–95. Sempowich

also testified that Rishe invited Seeling to entertain business partners in Sempowich's region, but did not invite Sempowich. See id. ¶¶ 96–97.

Tactile responded to Sempowich's complaint through the Human Resources department. See Watt Decl. [D.E. 47-5] ¶¶ 40–41. Tactile's Executive Human Resources consultant, Lynn Weiss ("Weiss"), investigated Sempowich's complaint. See id. ¶¶ 41–42; Sempowich Dep. [D.E. 48-1] 97–98. Weiss contacted Sempowich after receiving her complaint and, following the initial call, spoke with her several times during the investigation about the complaint and the head and neck position. See Sempowich Dep. [D.E. 48-1] 97–101. On March 1, 2018, Weiss interviewed Sempowich for a second time. See id. at 99–101; [D.E. 64-6] 17–22. Weiss's contract ended on March 6, 2018. At that point, the investigation into Sempowich's complaint was ongoing. See Folkes Dep. [D.E. 48-3] 27–28. Tactile hired counsel. See Watt Decl. [D.E. 47-5] ¶ 43; Mattys Dep. [D.E. 48-2] 44. Counsel interviewed Rishe, Sempowich, and several other Tactile employees. See Watt Decl. [D.E. 47-5] ¶ 45; Folkes Dep. [D.E. 48-3] 22. On March 30, 2018, counsel sent a report concerning the investigation to Tactile. See Folkes Decl. [D.E. 47-2] ¶ 17.

On February 27, 2018, Mattys called Sempowich. Sempowich believed Mattys was "trying to smooth things over" and "lay the groundwork of exactly why he wanted me in [the head and neck manager position.]" Sempowich Dep. [D.E. 48-1] 74. Mattys told Sempowich that the head and neck manager position was important to Tactile, and that her skills fit the position. See id. at 89–92; Mattys Dep. [D.E. 48-2] 47–50; [D.E. 63-13]. Mattys also stated that Tactile "would make sure comp[ensation] was not a reason to avoid the move." [D.E. 63-13]; see Mattys Dep. [D.E. 48-2] 54–55; Sempowich Dep. [D.E. 48-1] 90–91.

On March 1, 2018, Tactile transferred Sempowich's duties as regional sales manager of the Mid-Atlantic region to Seeling, but Sempowich remained employed as she considered Tactile's offer for the head and neck manager position. See [D.E. 46-7]; Folkes Decl. [D.E. 47-2] ¶ 11; Rishe Dep. [D.E. 48-4] 12. In October 2018, Tactile promoted Seeling to the area director position. See Mattys

Dep. [D.E. 139-10] 11–13.

On March 13, 2018, Folkes sent Sempowich an offer letter and job description for the head and neck manager position. See Sempowich Dep. [D.E. 48-1] 84–85; [D.E. 46-6]. The offer letter stated that Sempowich's "base salary [would] remain the same at $150,000 . . . . Tactile will guarantee your commission at $10,000/month for 6 months, March (prorated) through August of 2018, while working to define the program and develop criteria/metrics for a defined incentive plan. We will revisit the progress of the program and commissions at that time to evaluate the need for guarantee continuance or launch the incentive plan." [D.E. 46-6] 6.

Tactile's compensation policy states that Tactile "intends to establish and maintain pay levels which are competitive and compensate employees based on performance and contribution." [D.E. 46-12] 3; Watt Decl. [D.E. 47-5] ¶ 48. The policy also states that

> [c]ompensation will be adjusted based upon a number of factors including superior employee performance, market demands, expanded responsibilities and the like. Merit-based pay adjustments may be awarded by Tactile in an effort to recognize truly superior employee performance. The decision to award such an adjustment is dependent upon numerous factors, including the information documented in any performance evaluation process.

[D.E. 46-12] 3. Tactile's incentive plan for 2017 states that "[t]he purpose [of the plan] is to establish baseline performance standards and to motivate performance beyond base goals." [D.E. 46-13] 2. The incentive plan applied to all regional sales managers. See id. at 3.

Rishe and Folkes set Tactile's base salaries of regional sales managers and area directors. See Folkes Decl. [D.E. 47-2] ¶ 12; Rishe Decl. [D.E. 47-3] ¶ 62. Mattys reviews and approves those base salaries. See Folkes Decl. [D.E. 47-2] ¶ 13. When regional sales managers first accept the position, Rishe sets their base salary based "primarily" on "management experience and work history." Rishe Decl. [D.E. 47-3] ¶ 63. The candidates or Tactile's recruiters typically send Rishe historical salary information and expected salary. See id. at ¶ 64. For example, Folkes set Seeling's base salary in 2014, the year he accepted the regional sales manager position, in light of his sales

Case 5:18-cv-00488-D    Document 189    Filed 10/23/20    Page 15 of 50

management experience and compensation history. See Folkes Decl. [D.E. 47-2] ¶ 16.

In 2015, Sempowich's base salary was $120,000, and Seeling's base salary was $130,000. See [D.E. 49] 13. In 2016, Sempowich's base salary was $130,000, and Seeling's base salary was $135,000. See id. In 2017, Sempowich's base salary was $140,000, and Seeling's base salary was $142,000. See id. In 2015, Sempowich earned $65,333 in commissions, and Seeling earned $70,333. See id. In 2016, Sempowich earned $153,332 in commissions, and Seeling earned $103,332. See id. In 2017, Sempowich earned $197,334 in commissions, and Seeling earned $162,334. See id. In 2016 and 2017, Sempowich earned the most commissions among Tactile's female regional sales managers. See id. at 13 & n.4.

Tactile asked Sempowich to respond to the offer by March 16, 2018. See Folkes Dep. [D.E. 48-3] 32–33. Sempowich asked for a deadline extension, and Folkes extended the deadline to March 30, 2018. See Watt Decl. [D.E. 47-5] ¶ 46; Sempowich Dep. [D.E. 48-1] 108. Tactile communicated to Sempowich that if she did not take the head and neck manager position, her employment with Tactile would end. See [D.E. 47-5] ¶ 46.

Sempowich did not accept the head and neck manager position. On March 30, 2018, after the deadline to accept the position expired, Tactile confirmed that Sempowich was declining the position and provided Sempowich with information concerning the end of her employment. See Watt Decl. [D.E. 47-5] ¶ 47.

## II.

## A.

Sempowich seeks to exclude two spreadsheets Rishe used concerning certain year-over-year growth statistics for Tactile's regions under Federal Rule of Civil Procedure 37(e)(1). See [D.E. 25] 6–10; [D.E. 73-1, 73-2].[3] Specifically, Sempowich asserts that Tactile improperly failed to preserve

_____

[3] Tactile attached the disputed spreadsheets to its original response. See [D.E. 25] 6; [D.E. 76] 1 & n.1. However, in her response to Tactile's statement of material facts, Sempowich identifies

electronically stored information ("ESI") in the form of data sets and sales reports used to create the spreadsheets. See [D.E. 25] 1–2.

Rule 37(e)(1) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice[.]

Fed. R. Civ. P. 37(e)(1). Under Rule 37(e)(1), the moving party must first establish: "(1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery." Eshelman v. Puma Biotech., Inc., No. 7:16-CV-18-D, 2017 WL 2483800, at *4 (E.D.N.C. June 7, 2017) (unpublished); see Global Hookah Distribs., Inc. v. Avior, Inc., No. 3:19-CV-00177-KDB-DCK, 2020 WL 4349841, at *11 (W.D.N.C. July 29, 2020) (unpublished); MB Realty Grp. v. Gaston Cty. Bd. of Educ., No. 3:17-CV-00427-FDW-DCK, 2019 WL 2273732, at *2 (W.D.N.C. May 28, 2019) (unpublished); Knight v. Boehringer Ingelheim Pharm., Inc., 323 F. Supp. 3d 837, 844–45 (S.D. W. Va. 2018); Steve & Sons, Inc. v. JELD-WEN, Inc., 327 F.R.D. 96, 104 (E.D. Va. 2018). The moving party must then demonstrate prejudice. See MB Realty Grp., 2019 WL 2273732, at *2; Knight, 323 F. Supp. 3d at 845; Eshelman, 2017 WL 2483800, at *4. If the movant successfully demonstrates prejudice, the court has discretion to impose a sanction

---

two spreadsheets Tactile filed with its summary judgment motion that she asserts are "subject of a pending motion" and cites to her motion at docket entry 24. See [D.E. 104] ¶¶ 196–197, 199, 201–202; [D.E. 64-12, 63-9]. The document at docket entry 63-9 appears identical to Tactile's "Exhibit A" included with Tactile's response to Sempowich's motion to strike. Compare [D.E. 63-9] with [D.E. 73-1]. The document at docket entry 64-12 differs from Tactile's "Exhibit B." Compare [D.E. 64-12] with [D.E. 73-2]. Sempowich does not address this discrepancy in her reply, which she filed after Tactile moved for summary judgment and filed its exhibits, including the exhibit at docket entry 64-12. Cf. [D.E. 84]. Thus, the court analyzes the spreadsheets Sempowich explicitly identified in her motion.

proportional to the prejudice. See Knight, 323 F. Supp. 3d at 845; In re Ethicon, Inc., No. 2:12-CV-497, 2016 WL 5869448, at *3 (S.D. W. Va. Oct. 6, 2016) (unpublished); cf. Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (describing court's inherent power to impose sanctions for spoliation of evidence).[4]

As for a party's duty to preserve after reasonably anticipating litigation, the party must "preserve what it knows, or reasonably should know, is relevant in the anticipated action, is reasonably calculated to lead to the discovery of admissible evidence, or is reasonably likely to be requested during discovery." Steve & Sons, 327 F.R.D. at 107 (alterations omitted); see E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 803 F. Supp. 3d 469, 496 (E. D. Va. 2011). As for whether ESI is "lost" under Rule 37(e), a movant must demonstrate that the information is "irretrievable from another source, including other custodians." Steve & Sons, 327 F.R.D. at 107. As for prejudice, a movant must show that "as a result of the spoliation, [movant] cannot present evidence essential to its underlying claim." Al-Sabah v. Agbodjogbe, No. ELH-17-730, 2019 WL 4447235, at *5 (D. Md. Sept. 17, 2019) (unpublished) (quotation omitted); see Thompson v. Clarke, No. 7:11CV00111, 2019 WL 4039634, at *6 (W.D. Va. Aug. 27, 2019) (unpublished); Knight, 323 F. Supp. 3d at 845; Eshelman, 2017 WL 2483800, at *4.

Sempowich argues that: (1) Tactile was under a duty to preserve the data sets on Sempowich's EEOC charge filing date, March 27, 2018, and that the data sets are "necessary for the fact-finder to determine whether the spreadsheets take into account the impact on the Mid-Atlantic Region of Rishe's own decision to reassign territories and personnel;" (2) Tactile makes clear in its response to Sempowich's request for production that the data sets are lost; (3) Tactile acted unreasonably when it failed to image Rishe's hard drive or disable automatic deletion and overwrite

---

[4] Sempowich limits her arguments to Rule 37(e)(1). See [D.E. 25] 6–10. Rule 37(e)(1) addresses spoliation of ESI. Cf. Avior, 2020 WL 4349841, at *11; MB Realty Grp., 2019 WL 2273732, at *2.

functions in its software on March 27, 2018, and Rishe's deposition testimony concerning historical sales data for a "supplement to Plan versus Actual Reports" for another Tactile employee demonstrates that Tactile could "access data going back to 2015;" (4) Tactile makes clear in its discovery responses that it cannot restore or replace the data sets; and (5) Sempowich is prejudiced because "the most direct method of proving pretext would be to demonstrate that Rishe used inappropriate data sets when creating the statistics used to justify his decision." [D.E. 25] 9.

Sempowich has failed to demonstrate that Tactile should have preserved the ESI that she identifies. Sempowich conflates her argument that the data sets are "necessary" for the fact-finder to decide an issue "critical" to her Title VII claims—i.e., whether the spreadsheets take into account the impact on the Mid-Atlantic Region of Rishe's decision to reassign territories and personnel—with the data sets themselves. True, the court must address Sempowich's first argument, but production of the data sets are but one way for her to support her argument. For example, Sempowich could have explored whether the data sets are "necessary" while deposing Rishe. See Eshelman, 2017 WL 2483800, at *4–5 (collecting cases). Or Sempowich could have deposed the Tactile employee Rishe identified that accessed Tactile's Filemaker system to create the spreadsheets on InfoSource that Rishe requested. See id.; Cf. Rishe Dep. [D.E. 84-5] 4–5. At bottom, numerous other ways exist to accomplish the precise end Sempowich purports to pursue other than examining data sets she believes once existed on Tactile's servers. Thus, Sempowich has failed to meet her burden to show that Tactile should have preserved the data sets.[5]

Alternatively, even if Sempowich could meet initial requirements under Rule 37(e)(1), Sempowich has failed to demonstrate that Tactile's failure to produce the data sets prejudiced her. Tellingly, Sempowich does not argue that the data sets are essential to her claim. Cf. [D.E. 25] 9 ("[T]he most direct method of proving pretext would be to demonstrate that Rishe used inappropriate

---

[5] In light of the court's conclusion, the court declines to reach Sempowich's remaining arguments.

data sets . . . ."). Rightly so. As discussed, Sempowich could have pursued the information she purports to seek through deposition testimony. Accordingly, the evidence Sempowich seeks is not essential. Thus, Sempowich has failed to demonstrate prejudice concerning the ESI at issue, and the court denies Sempowich's motion under Rule 37(e)(1).

Sempowich also argues that the court should exclude the two spreadsheets under Federal Rules of Evidence Rule 802 and Rule 805. See [D.E. 25] 10; [D.E. 73-1, 73-2]. Sempowich asserts that Tactile relies on one of the two spreadsheets for the truth of Tactile's assertions concerning Sempowich's year-over-year growth statistics. See [D.E. 84] 6; [D.E. 25] 10. Sempowich then argues that, because Tactile cannot produce the data sets underlying Rishe's spreadsheets, Tactile cannot demonstrate that the data sets qualify for a hearsay exception. See [D.E. 25] 10.

Rule 802 provides that "[h]earsay is not admissible" unless an exception applies. Fed. R. Evid. 802. Under Rule 801, hearsay is defined as a statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). If an out-of-court statement is combined with another out-of-court statement, both statements must "conform[] with an exception to the rule" to be admissible. Fed. R. Evid. 805.

Assuming without deciding that the two spreadsheets and underlying data sets are hearsay statements, Tactile does not offer the statement to show that Sempowich's year-over-year percentage growth statistic in 2017 was, in fact, 22%. Cf. [D.E. 73-1] 3. Rather, Tactile offers the two spreadsheets to bolster its argument that Rishe believed Sempowich's growth statistics were "lagging." Sempowich is free to, and does, make the argument that Rishe's calculations are inaccurate. But that argument does not change the permissible non-hearsay purpose for which Tactile seeks the admission of the two spreadsheets. See In re C.R. Baird, Inc., MDL No. 2187, Pelvic Repair Sys. Prods. Liability Litig., 810 F.3d 913, 925–26 (4th Cir. 2016). Accordingly, the

20

court denies Sempowich's motion to strike.[6]

B.

Tactile moves to strike the expert report of Elizabeth Berry ("Berry") under Federal Rules of Evidence Rule 702. See [D.E. 44]; Berry Expert Report [D.E. 45-1]. Tactile asserts that: (1) Berry is not qualified because she lacks education and training to assess performance measures for sales employees of medical device companies, has no experience in the medical device field, and has only given expert testimony in bankruptcy cases; (2) Berry cannot explain why her method failed to reproduce data in a spreadsheet attributed to Rishe, cannot explain why her ultimate conclusion is reliable, has not previously used the method she applied here, ignored numerous considerations relevant to the analysis, and admitted that her report contains errors; and (3) Berry's opinion is irrelevant and not helpful because its purpose is to challenge Tactile's method for evaluating sales managers. See [D.E. 45] 7–14.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. See Fed. R. Evid. 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). "Rule 702 was intended to liberalize the introduction of relevant expert evidence," but "expert witnesses have the potential to be both powerful and quite

---

[6] In light of this conclusion, the court declines to reach the parties' arguments concerning the business records exception.

21

misleading." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (quotations omitted).

The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence. Id. A district court has broad latitude in determining whether to admit proposed expert testimony. See, e.g., United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994); Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 6748518, at *5 (E.D.N.C. Dec. 22, 2011) (unpublished).

Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert testimony is relevant and whether it is reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 589; United States v. Forrest, 429 F.3d 73, 80 (4th Cir. 2005). The trial court must perform its special gatekeeping obligation of ensuring that expert testimony meets both requirements. See, e.g., Kumho Tire, 526 U.S. at 147.

To be relevant, the proposed expert testimony must be helpful to the trier of fact. See Daubert, 509 U.S. at 591–92; United States v. Campbell, 963 F.3d 309, 314 (4th Cir. 2020). "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993). The relevancy requirement has been described as a question of "fit," and demands that "'expert testimony proffered in the case [be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). Thus, proffered expert testimony must only "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; see Daubert, 509 U.S. at 591–92. Rule 702 does not require that "proffered expert testimony [be] irrefutable or certainly correct." Silicon Knights, Inc. v. Epic Games, Inc., 2011 WL 5151345, at *3 (E.D.N.C. Oct. 28, 2011) (unpublished).

22

"[T]he test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quotations omitted); see Kumho Tire, 526 U.S. at 141–42. "In making its initial determination of whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). In analyzing reliability, a court should consider factors such as:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

Cooper, 259 F.3d at 199; see Daubert, 509 U.S. at 592–94; Silicon Knights, 2011 WL 6748518, at *6.

Berry's report states that she was asked to review two matters: "whether Tactile's year-over-year growth statistics are reproducible and statistically valid," and "whether [Tactile's year-over-year growth statistics] are a viable measure of Regional Sales Manager performance or whether they are measuring resources and territory added to the Region by Tactile Management." [D.E. 45-1] 2; cf. [D.E. 87] 7. Berry then discusses her methods and findings. See [D.E. 45-1] 2–5. Berry states that, from her analysis, she "was able to conclude to a reasonable degree of certainty that the Year-Over-Year growth statistics produced by Mr. Rishe do not accurately depict the performances of Regional Sales Managers or Area Directors because they do not properly account and control for the personnel, headcount, and territory expansion decisions made by Tactile Management." Id. at 5.

Berry's expert opinion, as stated in her expert report, is not relevant. See Fed. R. Evid. 702; Daubert, 509 U.S. at 591–92. The facts on which Berry opines (i.e., the relative accuracy of Tactile's year-over-year growth and regional sales manager performance) cannot be considered by the fact-

finder when determining whether Sempowich was meeting Tactile's legitimate expectations. See, e.g., Howard v. Coll. of the Albermarle, 262 F. Supp. 3d 322, 333 (E.D.N.C. 2017) (collecting cases), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished). By definition, then, Berry's opinion does not address a fact in issue. See Daubert, 509 U.S. at 591. Moreover, Berry's opinion does not help the fact-finder determine whether Tactile's proffered explanation concerning the end of Sempowich's employment was false. Berry's opinion does not attack the factual accuracy of the spreadsheet's statistics. Rather, Berry's opinion attacks the spreadsheets's suitability as a performance metric. Cf. [D.E. 45-1] 2–5. Essentially, Berry opines that her metric better represents a Tactile regional sales manager's performance than Tactile's metric as represented in the spreadsheets she attacks. That distinction takes the opinion Berry rendered outside of the logic of the cases that Sempowich cites. Cf. [D.E. 87] 15–16. It also demonstrates that Berry's opinion will not help the fact-finder determine pretext. Neither Berry nor this court get to decide Tactile's performance metrics. See, e.g., Hux v. City of Newport News, 451 F.3d 311, 315–19 (4th Cir. 2006); Jiminez v. Mary Washington Coll., 57 F.3d 369, 383–84 (4th Cir. 1995). Accordingly, the court grants Tactile's motion to strike Berry's expert opinion.

The court also rejects Sempowich's attempt to introduce new opinions from Berry in Berry's declaration in response to Tactile's motion to strike Berry's expert report. Under Rule 26(a)(2), parties must disclose the identities of expert witnesses and the experts must provide a written report. See Fed. R. Civ. P. 26(a)(2)(A)–(B). Under Rule 26(e)(2), parties have a continuing obligation to supplement their expert disclosures. See Fed. R. Civ. P. 26(e)(2). "Supplementation of an expert report permits a party to correct inadvertent errors or omissions. Supplementation, however, is not a license to amend an expert report to avoid summary judgment." OmniSource Corp. v. Heat Wave Metal Processing, Inc., No. 5:13-CV-772-D, 2015 WL 3452918, at *9 (E.D.N.C. May 29, 2015) (unpublished); Western Plastics v. DuBose Strapping, Inc., 334 F. Supp. 3d 744, 754 (E.D.N.C. 2018); Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008); see

Beller ex rel. Beller v. United States, 221 F.R.D. 696, 701 (D.N.M. 2003) ("[Rule 26(e)] does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness report . . . ." (quotation omitted)); Coles v. Perry, 217 F.R.D. 1, 3 (D.D.C. 2003) ("[Rule] 26(e) does not grant a license to supplement a previously filed expert report because a party wants to . . . ."). Courts distinguish "true supplementation" from gamesmanship. See Western Plastics, 334 F. Supp. 3d at 754; Gallagher, 568 F. Supp. 2d at 631. Otherwise, "there would be no finality to expert reports" and "each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." Beller, 221 F.R.D. at 701.

"If a party fails to [timely] provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). A district court has broad discretion to evaluate whether a failure to disclose was substantially justified or harmless. See S. States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). In making this determination, the court should consider five factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Id.

As discussed, Berry rendered an opinion in her expert report that Rishe's two spreadsheets did not "accurately depict the performances of Regional Sales Mangers or Area Directors because they do not properly account and control for the personnel, headcount and territory expansion decisions made by Tactile Management." Berry Expert Report [D.E. 45-1] 5. Although Berry notes that she was "asked to opine on whether Tactile's year-over-year growth statistics are reproducible and statistically valid," nowhere in her report or the attachments to her report does she, in fact, so opine. See id. at 2. Instead, Berry waited until four months after this court's deadline to file expert

reports, and two months after her deposition, to offer an opinion concerning whether the data contained in the spreadsheets was "readily reproducible using data generated directly from Tactile's enterprise software system." Berry Decl. [D.E. 87-2] ¶ 10; see id. at ¶¶ 11–14. Thus, Tactile did not have the opportunity to conduct discovery or address Berry's additional opinions in Berry's deposition. Moreover, Sempowich offers no explanation or justification for Berry's failure to include the additional opinions she makes in her declaration in the original expert report. See [D.E. 176]. The court finds that Sempowich's late-filed declaration from Berry was both an effort to stave off Tactile's motion to strike Berry's expert report and Tactile's motion for summary judgment. See Western Plastics, 334 F. Supp. 3d at 754; Gallagher, 568 F. Supp. 2d at 631. Accordingly, the court declines Sempowich's invitation to consider Berry's additional opinions contained in Berry's late-filed declaration.[7]

### III.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

---

[7] Sempowich moves to strike Tactile's response expert report of accountant Gregory Cowhey concerning damages. See [D.E. 30]. Sempowich's motion, however, is premature. The two pending dispositive motions are Tactile's motion for summary judgment and Sempowich's partial motion for summary judgment concerning certain affirmative defenses. Accordingly, the court denies as premature Sempowich's motion to strike the expert report of George Cowhey.

475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248; Hux, 451 F.3d at 315–16.

A.

Sempowich alleges three claims under Title VII: (1) discrimination based on sex (count two); (2) discrimination based on sex plus age (count three);[8] (3) retaliation (count four). See Compl. [D.E. 1-1] ¶¶ 105–28. The parties address Sempowich's Title VII discrimination claims together. See [D.E. 103] 10–35; [D.E. 143] 15–25. The court likewise considers those claims together. Sempowich also alleges a claim under the Equal Pay Act (count one) and a wrongful discharge claim under North Carolina law (count five). Tactile moves for summary judgment on each count.[9]

---

[8] The court assumes without deciding that Sempowich is entitled to bring a sex plus age claim. Cf. Earwood v. Cont'l Se. Lines, Inc., 539 F.2d 1349, 1351 (4th Cir. 1976); Mason v. North Carolina Dep't of Corrs., No. 5:12–CV–382–BO, 2014 WL 3891360, at *3 n.4 (E.D.N.C. Aug. 7, 2014) (unpublished).

[9] The court grants Sempowich's motion for leave to untimely file exhibits in support of her response in opposition to Tactile's summary judgment motion. See [D.E. 115].

27

1.

Title VII prohibits an employer from discharging an employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation in two ways. First, a plaintiff can show through direct evidence that sex discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence (as in this case), a plaintiff can alternatively proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013). The McDonnell Douglas framework applies to both discrimination and retaliation claims under Title VII. See, e.g., Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam v. South Carolina Dep't of Juvenile Just., 474 F.3d 134 (4th Cir. 2007).

Under McDonnell Douglas, a plaintiff establishes a prima facie case of sex discrimination by showing that (1) she is a member of a protected class, (2) she suffered adverse employment action, (3) she was fulfilling her employer's legitimate expectations at the time of the adverse employment action, and (4) the discharge occurred under circumstances permitting a reasonable inference of sex discrimination. See, e.g., Hill, 354 F.3d at 285; Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Tahir v. Sessions, No. 5:16-CV-781-D, 2017 WL 1735158, at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished); Howard v. Coll. of the Albermarle, 262 F. Supp. 3d 322, 331 (E.D.N.C. 2017)

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant

28

offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [sex or age] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147. The "crucial issue" is whether "an unlawfully discriminatory motive for a defendant's conduct [exists], not the wisdom or folly of its business judgment." Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir. 1995)

In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on an illegal basis. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. Under Reeves and its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false; [she] must also show that the employer discriminated against [her] on the basis of [sex or age]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

In seeking summary judgment, Tactile argues that the reassignment of the Mid-Atlantic region and the offer to Sempowich of the head and neck manager position were not adverse employment actions. See [D.E. 143] 16–17. Additionally, Tactile argues that Sempowich was not meeting Tactile's legitimate employment expectations as a regional sales manager when Rishe reassigned the Mid-Atlantic region to Seeling, and that neither sex nor age were a factor in Tactile's

Case 5:18-cv-00488-D   Document 189   Filed 10/23/20   Page 29 of 50

decision to reassign the Mid-Atlantic region or offer her the head and neck manger position. See id. at 17–20. Lastly, Tactile contends that Sempowich's allegations concerning an "old boys' club" at Tactile do not raise a genuine issue of material fact about sex or age discrimination in Tactile's employment decisions concerning Sempowich. See id. at 20–22.

As for Tactile's arguments concerning adverse employment action, an adverse employment action must "adversely affect the terms, conditions, or benefits of the plaintiff's employment." Holland, 487 F.3d at 219 (alteration and quotation omitted); see Adams v. Anne Arundel Cty. Pub. Schs., 789 F.3d 422, 430–31 (4th Cir. 2015); James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375–76 (4th Cir. 2004); Pledger v. UHS-Pruitt Corp., No. 5:12-CV-484-F, 2013 WL 1751373, at *6 n.10 (E.D.N.C. Apr. 23, 2013) (unpublished); Gray v. Walmart Stores, Inc., No. 7:10-CV-171-BR, 2011 WL 4368415, at *2 (E.D.N.C. Sept. 19, 2011) (unpublished). Typical examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, [and] reduced opportunities for promotion." Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999); see Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc). Reassignment—and a corresponding change in working conditions—can constitute an adverse employment action, but only if it has a "significant detrimental effect" on the plaintiff. Boone, 178 F.3d at 256; see Adams, 789 F.3d at 431; Williams v. Brunswick Cty. Bd. of Educ., 725 F. Supp. 2d 538, 547 (E.D.N.C. 2010), aff'd, 440 F. App'x 169 (4th Cir. 2011) (per curiam) (unpublished). A lateral transfer that does not affect pay, benefits, or seniority, however, is not an adverse employment action. See James, 368 F.3d at 375–76; Boone, 178 F.3d at 256–57; Walls v. Pitt Cty. Bd. of Educ., No. 4:13-CV-104-D, 2015 WL 4994259, at *5–6 (E.D.N.C. Aug. 19, 2015) (unpublished); Williams, 725 F. Supp. 2d at 549; Stout v. Kimberly Clark Corp., 201 F. Supp. 2d 593, 602 (M.D.N.C. 2002); see also Scurlock-Ferguson v. City of Durham, 381 F. App'x 302, 302 (4th Cir. 2010) (per curiam) (unpublished); Csicsmann v. Sallada, 211 F. App'x 163, 168 (4th Cir. 2006) (per curiam) (unpublished). When analyzing a transfer or reassignment, the "mere fact that

30

a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." James, 368 F.3d at 376; see Boone, 178 F.3d at 256–57. Moreover, an employee's perception of the new position as a demotion is close to irrelevant. See James, 368 F.3d at 375; Boone, 178 F.3d at 256–57; Williams, 725 F. Supp. 2d at 547.

Viewing the evidence in a light most favorable to Sempowich, a genuine issue of material fact exists concerning whether Tactile's employment actions concerning Sempowich were adverse. The head and neck position did not have supervisory responsibilities (i.e., no Tactile employee would have directly reported to Sempowich). In contrast, Sempowich supervised 15 Tactile employees as regional sales manager in the Mid-Atlantic region. Cf. Boone, 178 F.3d at 255–56; Rutledge v. North Carolina Dep't of Revenue, No. 1:14CV45, 2015 WL 790288, at *3 (M.D.N.C. Feb. 25, 2015) (unpublished) (collecting cases). Although Folkes stated on March 14, 2018, that Sempowich would receive restricted stock units as part of her compensation package for the head and neck position, restricted stock units were not part of the formal offer letter Folkes sent to Sempowich on March 13, 2018. See James, 368 F.3d at 375–76; Boone, 178 F.3d at 255–56. Moreover, Tactile admits that the head and neck position's responsibilities better fit Sempowich's skill set, which suggests implicitly that the regional sales manager responsibilities were different in character. Thus, at summary judgment, the court rejects Tactile's argument concerning adverse employment action. See Adams, 789 F.3d at 430–31; Boone, 178 F.3d at 256; Williams, 725 F. Supp. 2d at 547.

As for Tactile's argument concerning whether Sempowich was meeting Tactile's legitimate employment expectations as regional sales manager at the time of the transfer of her regional sales manager duties to Seeling and the proposed new head and neck position, when a court analyzes whether an employee was meeting her employer's legitimate expectations, "it is the perception of the [employer] which is relevant, not the self-assessment of the plaintiff." Hawkins, 203 F.3d at 280 (4th Cir. 2000) (alteration and quotation omitted); see Warch v. Ohio Cas. Ins. Co., 435 F.3d 510,

31

518 (4th Cir. 2006); King, 328 F.3d at 149; Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006). Thus, an employee's own testimony about her job performance does not create a genuine issue of material fact as to whether she was meeting her employer's legitimate expectations. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith, 618 F.2d at 1067; Smith v. Martin, No. 5:10-CV-248-D, 2011 WL 3703255, at *5 (E.D.N.C. Aug. 23, 2011) (unpublished); O'Daniel v. United Hospice, No. 4:09-CV-72-D, 2010 WL 3835024, at *4 (E.D.N.C. Sept. 29, 2010) (unpublished); Lloyd v. New Hanover Reg'l Med. Ctr., No. 7:06-CV-130-D, 2009 WL 890470, at *9 (E.D.N.C. Mar. 31, 2009) (unpublished); McDougal-Wilson, 427 F. Supp. 2d at 611. Even though a plaintiff may contest the factual accuracy of an employer's critiques, the issue is whether the decisionmaker believed the critiques to be true. See Holland, 487 F.3d at 215–17; Hill, 354 F.3d at 293–94. Moreover, the employee must show that she was meeting the employer's legitimate expectations at the time of the adverse employment action. See, Warch, 435 F.3d at 517; Addison v. CMH Homes, Inc., 47 F. Supp. 3d 404, 420 (D.S.C. 2014); Jones v. Dole Food Co., Inc., 827 F. Supp. 2d 532, 547 (W.D.N.C. 2011), aff'd, 473 F. App'x 270 (4th Cir. 2012) (unpublished).

The court does "not sit as a super-personnel department weighing the prudence of employment decisions." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (quotation omitted). An employer can set its own performance standards so long as "such standards are not a 'mask' for discrimination." Beall, 130 F.3d at 619; McDougal-Wilson, 427 F. Supp. 2d at 607. To that end, the employee may show that the employer's expectations were somehow "not legitimate" or that the expectations "were a sham designed to hide the employer's discriminatory purpose." Warch, 435 F.3d at 518 (quotation omitted); see Smith v. Premier Prop. Mgmt., 793 F. App'x 176, 179 (4th Cir. 2019) (per curiam) (unpublished); Addison, 47 F. Supp. 3d at 420.

32

Even viewing the evidence in a light most favorable to Sempowich, no rational jury could find that she was meeting Tactile's legitimate expectations as regional sales manager at the time of Tactile's decision to reassign the Mid-Atlantic region's duties to Seeling and to offer her the head and neck position. Sempowich's performance reviews for 2015 and 2016 noted that turnover, retention, and development of employees were priorities for Sempowich and Tactile. Specifically, Sempowich's 2016 performance review stated that one of her goals for 2017 was to decrease turnover in employees "below company averages." [D.E. 62-15]; see Sempowich Dep. [D.E. 48-1] 40–41, 44–46. Sempowich's Mid-Atlantic region did not meet Tactile's 2017 goal to increase the total number of employees working in the region, and turnover in the region continued with at least seven employees leaving the company for various reasons. See Rishe Decl. [D.E. 47-3] ¶ 46; Watt Decl. [D.E. 47-5] ¶¶ 26–38. Sempowich also did not achieve the quota Tactile set in 2017 for Flexitouch order completes, and the Mid-Atlantic region had the lowest growth over all accounts. See [D.E. 63-8]; [D.E. 64-12]. Rishe attributed each shortcoming in the Mid-Atlantic region to Sempowich, and Rishe believed that the shortcomings hurt Tactile's overall growth. See Rishe Decl. [D.E. 47-3] ¶¶ 56–57; cf. Holland, 487 F.3d at 215–17; Hill, 354 F.3d at 293–94; Beall, 130 F.3d at 619; McDougal-Wilson, 427 F. Supp. 2d at 607.

In opposition, Sempowich argues that her "compensation history"—i.e., the commissions she earned in 2016 and 2017, the $10,000 raise three weeks before Tactile reassigned the Mid-Atlantic region, and restricted stock units Tactile granted—permit an inference that Sempowich was meeting Tactile's legitimate expectations as regional sales manager when Tactile reassigned the duties and offered her a new position. Sempowich also asserts that the performance awards Tactile gave to her, Sempowich's performance ratings on her evaluation, her "productivity" scores, and other metrics Tactile used to measure performance permit the same inference. See [D.E. 103] 11–14.

Sempowich has not produced evidence of a performance review, or any other document or evaluation, from Tactile at the time Tactile decided to reassign the duties of the Mid-Atlantic region

33

to Seeling that shows Tactile believed she was meeting the company's legitimate expectations as a regional sales manager. Moreover, Sempowich's perception of Tactile's statistics or measures of performance that best demonstrate her performance relative to the company's expectations is not relevant. See Warch, 435 F.3d at 518; Hawkins, 203 F.3d at 280; King, 328 F.3d at 149 ; Flax, 618 F.2d at 1067; McDougal-Wilson, 427 F. Supp. 2d at 607. Sempowich has failed to produce evidence that Tactile did not believe the critiques of her performance. Essentially, Sempowich invites the court to second-guess Tactile's employment decision to reassign the Mid-Atlantic region and offer her the head and neck position based on the statistics she deems relevant to that decision. The court declines the invitation. See, e.g., Westinghouse, 406 F.3d at 272.

Sempowich also cites Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019), and analogizes to the two bases the Haynes court found supported an inference that plaintiff was meeting the company's legitimate expectations: (1) approximately two weeks before terminating plaintiff's employment in Haynes, plaintiff's supervisor told him that "'everything looks good' and there was 'nothing to worry about' regarding his upcoming performance review"; and (2) plaintiff "received bonuses for the period in question." Haynes, 922 F.3d at 225; see [D.E. 103] 11–12. Even assuming that the second basis is analogous to Sempowich's compensation history with Tactile,[10] Haynes offers Sempowich no comfort. In Haynes, the supervisor's statements contradicted claims the company made for the first time during litigation that plaintiff had committed several employment infractions in close temporal proximity to the supervisor's statements. Haynes, 922 F.3d at 222, 225. Not so here. No Tactile employee indicated, explicitly or otherwise, that Sempowich did not have to worry about her performance before Rishe called Sempowich to inform her that Tactile reassigned the duties of the Mid-Atlantic region. Rather, as discussed, Rishe

_____

[10] Haynes does not make clear the factual particulars of the "period in question"—length of the time period, when that time period occurred relative to the termination of plaintiff's employment, the reasons the company awarded bonuses, and more—are sufficient for the court to draw the analogy on this point to Sempowich.

34

repeatedly had raised the performance issues Tactile considered when deciding to reassign Sempowich with her both in her performance reviews and in private conversation. Thus, Haynes does not help Sempowich.

Sempowich also argues that Tactile's performance expectations are "illegitimate" (i.e., "a sham designed to hide the employer's discriminatory purpose"), and incorporates certain arguments she makes concerning pretext. [D.E. 103] 13–14; see id. at 27–35. Specifically, Sempowich argues: (1) Tactile's assertions concerning year-over-year growth are not legitimate because Rishe's management decisions (i.e., removing the Maryland and Virginia territories from the Mid-Atlantic region) "placed the Mid-Atlantic region at a disadvantage," Tactile did not "punish male employees for failing to produce 'year-over-year growth,' nor did it allow the production of significant 'year-over-year' growth to deter it from terminating female Regional Managers," and the year-over-year growth statistic is "inconsistent" with Tactile's "sales performance tracking documents, performance evaluations and compensation plants"; (2) Tactile's argument concerning recruiting is not legitimate because other Tactile regions struggled to recruit, Rishe did not fire other managers for failures to recruit, regional sales managers "did not control the recruitment process by 2017," and Rishe's memorialization of Sempowich's difficulties recruiting in the Mid-Atlantic region occurred three days before reassigning her to the head and neck position; and (3) Tactile's retention argument is not legitimate because Tactile controlled the termination and transfer of employees, Tactile did not terminate the employment of other regional sales managers because of turnover, and Tactile did not "explain how Sempowich's development of her direct reports was any different in 2017 than in previous years when her efforts in this area were considered an 'exceptional strength' or 'focus.'" [D.E. 103] 27–35.

Sempowich's arguments do not concern the legitimacy of Tactile's employment expectations. Rather, her arguments target the inputs Tactile chose for performance-based metrics, and how she believes those metrics should be interpreted. Even viewing the evidence in a light most favorable

35

to Sempowich, no rational jury could find that Tactile's expectations were a "sham." Tactile discussed employee turnover and hiring during Sempowich's 2015 and 2016 performance reviews. See [D.E. 62-12]; [D.E. 62-15]. Moreover, Sempowich's business plan in the third quarter of 2017 acknowledged that the Mid-Atlantic region struggled with "headcount." See [D.E. 63-5] 2. Indeed, Rishe and Sempowich met with Carter and Bath to discuss strategies to increase hiring for the Washington, D.C. area. See Sempowich Dep. [D.E. 48-1] 53; Rishe Dep. [D.E. 48-4] 54; Carter Dep. [D.E. 48-5] 10; [D.E. 63-4]. Around the same time, Rishe circulated an email discussing the "gap" the Mid-Atlantic region needed to "close" concerning year-to-date sales metrics of Tactile's Flexitouch product. See [D.E. 63-8]. Sempowich acknowledged in the call with Rishe she recorded on February 22, 2018, that she did not grow sales in the Mid-Atlantic region the way Tactile was measuring such growth. Furthermore, Sempowich opined that factors out of her control were to blame for the region's growth statistics. See [D.E. 64-7] 12–13. At no point during that call did Sempowich question the validity of Tactile's year-over-year growth statistic, and year-over-year growth is a statistic Tactile consistently uses internally and in communications with shareholders. See Rishe Decl. [D.E. 47-3] ¶ 4; Mattys Dep. [D.E. 48-2] 6–7, 51. Additionally, Sempowich's explanation concerning why Rishe moved the Maryland and Virginia territories out of the Mid-Atlantic region is speculative. Sempowich has not adduced evidence concerning the reason Tactile moved those territories. On the contrary, the record evidence shows that Tactile moved territories among regions based on its business interests. See Rishe Decl. [D.E. 47-3] ¶¶ 28–30; Sempowich Dep. [D.E. 48-1] 10–11; Rishe Dep. [D.E. 48-4] 43–44, 59. Accordingly, even viewing the evidence in a light most favorable to Sempowich, no rational jury could find that Tactile's expectations were illegitimate. See Premier Prop. Mgmt., 793 F. App'x at 179; Warch, 435 F.3d at 518; Addison, 47 F. Supp. 3d at 420.

Even viewing the evidence in the light most favorable to Sempowich, no rational jury could find that Sempowich was meeting Tactile's legitimate expectations of employment as regional sales

manager at the time of the transfer of the duties to Seeling, the proposed new position for Sempowich, and the ultimate termination of Sempowich's employment when she declined the new position. Thus, the court grants summary judgment to Tactile concerning Sempowich's Title VII sex discrimination and sex-plus-age discrimination claims.

Alternatively, even viewing the evidence in a light most favorable to Sempowich, no rational jury could find that Tactile's reasons for its employment decisions were pretexts for discrimination based on sex or age. Tactile's explanation for reassigning the Mid-Atlantic region from Sempowich to Seeling—poor performance due to Sempowich's failures to achieve Tactile's goals for hiring and turnover—comports with Sempowich's 2015 and 2016 performance reviews, the third-quarter 2017 business plan Sempowich created, Rishe's communications with Sempowich concerning hiring in the Washington, D.C. area in 2017, Rishe's communication concerning closing the "gap" in growth in the Mid-Atlantic region in 2017, and Sempowich's comments to Rishe during the phone call in February 2018. See [D.E. 62-12, 63-5, 63-8]. Tactile's explanation also comports with the metrics Tactile used to evaluate growth of its regions, and that the Mid-Atlantic region grew at a slower pace both than projected and than other Tactile regions. See [D.E. 73-1, 73-2]. This consistency, coupled with contemporaneous documentation by both Tactile and Sempowich, is strong evidence that Tactile's reasons for reassigning the Mid-Atlantic region were not pretextual. See Nnadozie v. ManorCare Health Servs., Inc., 792 F. App'x 260, 263 (4th Cir. 2019) (per curiam) (unpublished); Johnson v. Edward D. Jones & Co., 771 F. App'x 342, 342 (4th Cir. 2019) (per curiam) (unpublished); Russel v. Harlow, 771 F. App'x 206, 207 (4th Cir. 2019) (per curiam) (unpublished); Anderson v. Discovery Commc'ns, LLC, 517 F. App'x 190, 196 (4th Cir. 2013) (per curiam) (unpublished); Mascone v. Am. Physical Soc., Inc., 404 F. App'x 762, 764 (4th Cir. 2010) (per curiam) (unpublished); Brown v. Marriot Int'l, Inc., 330 F. App'x 27, 27–28 (4th Cir. 2009) (per curiam) (unpublished); Baldwin v. England, 137 F. App'x 561, 564 (4th Cir. 2005) (per curiam) (unpublished).

37

In opposition, Sempowich makes two arguments. First, Sempowich asserts that Tactile's decision to reassign the Mid-Atlantic region to Seeling was part of Rishe's plan to promote Seeling to the area director position, and that Rishe's plan comports with Rishe's "pattern of sex-based double standards." See [D.E. 103] 22–26. Second, as discussed, Sempowich asserts that Tactile's stated reasons for reassigning the Mid-Atlantic region—poor growth in the region due to slow hiring and increased turnover—are false. See id. at 27–35.

Even viewing the evidence in a light most favorable to Sempowich, no rational jury could infer that the alleged sex-based preferences at Tactile were connected to Rishe's decision to reassign the Mid-Atlantic territory from Sempowich to Seeling. On the contrary, Sempowich's argument invites the court to speculate that Rishe favored the male employees at Tactile over the female employees in each decision he made. The record, however, belies such speculation. For example, Rishe approved rehiring Sempowich, promoted her, and recommended her for the head and neck position. Cf. Taylor v. Virginia Union Univ., 193 F.3d 219, 231 (4th Cir. 1999) (en banc) (discussing same-actor inference); Proud v. Stone, 945 F.2d 796, 797–98 (4th Cir. 1991) (same). Moreover, the first Tactile employee to hold the area director position was a woman: Jackie Gorham. See Folkes Dep. [D.E. 48-3] 5; Rishe Dep. [D.E. 48-4] 49–50. Tactile promoted Sempowich to the regional sales manager position by taking territory from an existing region that a male Tactile employee directed. See Rishe Decl. [D.E. 47-3] ¶ 31; Rishe Dep. [D.E. 48-4] 43–44. Tactile also terminated the employment of a male regional sales manager and replaced him with Karin Duprey. See Watt Decl. [D.E. 47-5] ¶ 11; [D.E. 65-8] 10. Accordingly, the court declines Sempowich's invitation to speculate that the alleged sex-based preferences she identifies are connected to Rishe's decision to reassign the duties of the Mid-Atlantic region. See Eke v. CaridianBCT, Inc., 490 F. App'x 156, 167–68 (10th Cir. 2012) (per curiam) (unpublished); Farrell v. Butler Univ., 421 F.3d 609, 614–15 (7th Cir. 2005); Meier v. Shawnee Mission Med. Ctr., Inc., No. 18-CV-2368-JWL, 2019 WL 4537264, at *6 (D. Kan. Sept. 19, 2019); Bucek v. Gallagher

38

Bassett Servs., Inc., No. 16-CV-1344 (KMK), 2018 WL 1609334, at *13–14 (S.D.N.Y. Mar. 29, 2018) (unpublished) (collecting cases).

In opposition, Sempowich cites Corti v. Storage Technology Corp., 199 F.3d 1326, 1999 WL 978887 (4th Cir. 1999) (unpublished table opinion), and argues that the testimony of female peers at Tactile concerning an alleged "sexist environment," coupled with Sempowich's success as a regional sales manager compared to male counterparts, creates a jury question on pretext. See [D.E. 103] 26. Corti, however, does not help Sempowich. In Corti, the Fourth Circuit held that individual statements from female employees (including allegations of sexual harassment), a "history of failing to hire and retain women and other minorities," and the defendant company's choice to "substantially ignore profitability in its decision making regarding its sales force" together with the company's failure to provide evidence concerning its employee evaluation process created a material dispute concerning pretext. See Corti, 1999 WL 978887, at *2–3. Not so here. As discussed, Tactile has hired and retained female candidates to the regional sales manager and area director positions, has evaluated sales growth and performance in making decisions to promote or retain regional sales managers, and has provided voluminous evidence concerning its evaluation processes. See Rishe Decl. [D.E. 47-3] ¶ 4; Mattys Dep. [D.E. 48-2] 6–7, 51; Rishe Dep. [D.E. 48-4] 49–50; [D.E. 65-8] 10; [D.E. 73-1]; [D.E. 73-2] . Even assuming that the testimony Sempowich cites from former female Tactile employees was of the same character of that in Corti (which it is not), the Corti court carefully noted that the collective evidence described above created a jury question on pretext, not any one fact. Not so here. Accordingly, the court rejects Sempowich's argument concerning Corti.

As for Sempowich's arguments concerning Rishe's decision to promote Seeling, even viewed in a light most favorable to Sempowich, no rational jury could find that Rishe's actions demonstrate that Tactile's stated reasons for reassigning the duties of the Mid-Atlantic region were pretexts for discriminating against Sempowich based on sex. On the contrary, Mattys's testimony makes clear that one employment decision (i.e., the reassignment of the Mid-Atlantic territories) could have

39

occurred without the other (i.e., Seeling's promotion). [D.E. 139-10] 12–13. Sempowich makes much of Rishe's "contemporaneous email communications and testimony regarding the decision-making timeline." [D.E. 103] 22. Even if the court assumes that Rishe's emails to Seeling concerned his promotion to area director, Sempowich does not cite record evidence that connects those email conversations to Tactile's decision to reassign the Mid-Atlantic territories. See [D.E. 107-7]. Nor does the record evidence reveal a connection between Rishe's emails to Seeling, and Rishe's conversations with Mattys and Folkes during the fall 2017 budgeting cycle. Rather, to make both connections, Sempowich weaves a web of inferences to arrive at her ultimate speculation concerning Rishe's motives for reassigning the duties of the Mid-Atlantic territory and promoting Seeling. Such inferences and "mere speculation" do not create a genuine issue of material fact concerning pretext. See Othenec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008); Beale, 769 F.2d at 214. Moreover, Sempowich's arguments ask the court to discern the propriety of Tactile's employment decisions. See, e.g., Westinghouse, 406 F.3d at 272; DeJarnette, 133 F.3d at 299. But this court may only analyze whether those decisions, and the explanations concerning such decisions, mask discriminatory motives. See Hux, 451 F.3d at 315 ("Duty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with the authority to strip employers of their basic business responsibilities."). They do not.

As for Sempowich's arguments concerning the untruthfulness of Tactile's proffered explanation for reassigning the Mid-Atlantic region, the court rejects Sempowich's arguments. As discussed, Sempowich's argument that Rishe "set [her] up for failure" by moving the Maryland and Virginia territories out of the Mid-Atlantic region is speculative. The reassignment of those territories occurred at the end of 2016, well before Rishe and Tactile management began discussions to reassign the Mid-Atlantic territory. Moreover, Tactile moved territories among its regions based on business needs. Even viewing the record in a light most favorable to Sempowich, Sempowich

40

does not identify record evidence demonstrating another reason for such a move. And, as discussed, the court cannot speculate on such a motive. See Phelan, 526 F.3d at 140; Beale, 769 F.3d at 214.

As for Sempowich's argument concerning Tactile's growth measures and its treatment of "male and female regional sales managers," the Tactile employees she identifies were not similarly situated. Cf. Haynes, 922 F.3d at 224. Moreover, Sempowich's argument (again) invites the court to discern the reasons for its employment decisions. This court (again) must decline that invitation. See, e.g., Hux, 451 F.3d at 315–18; Westinghouse, 406 F.3d at 272; DeJarnette, 133 F.3d at 299. And even if the court were to consider the comparisons, Sempowich fails to demonstrate the circumstances surrounding the employment decisions she identifies such that the court could, without speculating, determine the role year-over-year growth played in Tactile's individual decisions. See Laing v. Fed. Express Corp., 703 F.3d 713, 721 (4th Cir. 2013); King, 328 F.3d at 151–52.

As for Sempowich's arguments concerning recruiting, the employees and regions she identifies were not similarly situated. See Laing, 703 F.3d at 721; King, 328 F.3d at 151–52. Moreover, although Sempowich did not "control the recruiting process," she played a role in that process and admitted, in conversation with Rishe and in her fall 2017 performance report, that recruiting was an issue in the Mid-Atlantic region. See Sempowich Dep. [D.E. 48-1] 53; [D.E. 63-4]; [D.E. 63-8]. Furthermore, Sempowich's arguments concerning Rishe's email on February 9, 2018, to "get on the record," even viewing the facts in a light most favorable, do not rise above speculation. See Phelan, 526 F.3d at 140; Beale, 769 F.3d at 214.

As for Sempowich's arguments concerning employee turnover, they do not directly address Tactile's stated reason for reassigning the duties of the Mid-Atlantic region (i.e., poor sales growth due to unsatisfactory hiring and turnover). Rather, Sempowich argues that various factors demonstrate turnover was either not attributable to Sempowich, inconsistent with past evaluations, or due to factors beyond her control. See [D.E. 103] 33–35. Those arguments do not tend to show

41

that Tactile's stated reason – turnover – was false. Instead, Sempowich's arguments merely attempt to disclaim a role in the Mid-Atlantic region's turnover of employees. That discussion, however, is a core business dispute that does not bear on the Title VII analysis. See, e.g., Hux, 451 F.3d at 315–18; Westinghouse, 406 F.3d at 272; DeJarnette, 133 F.3d at 299. Accordingly, the court grants summary judgment to Tactile concerning Sempowich's sex and sex plus age Title VII discrimination claims.

2.

As for Sempowich's retaliation claim, Sempowich must prove that (1) she engaged in a protected activity under Title VII, (2) her employer took action against her that a reasonable employee would find materially adverse, and (3) her employer took the adverse action because of the protected activity. See DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Boyer-Libero v. Fontainbleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc); Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–70 (2006). "Retaliation claims . . . require the employee to show that retaliation was a but-for cause of a challenged adverse employment action." Guessous v. Fairview Prop. Inv., LLC, 828 F.3d 208, 217 (4th Cir. 2016) (citation and quotation omitted); see Nassar, 570 U.S. at 350. "Naked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." Huckelba v. Deering, No. 5:16-CV-247-D, 2016 WL 6082032 at *3 (E.D.N.C. Oct. 17, 2016) (unpublished). Furthermore, the employee must demonstrate temporal proximity between the alleged retaliation and the protected activity. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 274 (2001) (per curiam); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Brown v. Wake Cty. Gov., No. 5:16-CV-806, 2017 WL 2982971, at *4 (E.D.N.C. July 12, 2017) (unpublished); Huckelba, 2016 WL 6082032, at *4.

For purposes of Sempowich's Title VII retaliation claim, the court assumes without deciding that Sempowich's complaints concerning age and sex discrimination on February 22, 2018, to

42

Tactile's Human Resources department constitute protected activity under Title VII, and the end of Sempowich's employment with Tactile on March 30, 2018, was an adverse employment action. Nonetheless, even viewing the evidence in a light most favorable to Sempowich, no rational jury could find that Tactile's termination of Sempowich's employment was because of Sempowich's complaints on February 22, 2018. Rishe communicated Tactile's decision to reassign the duties of the Mid-Atlantic region and offer Sempowich the head and neck position on February 12, 2018, ten days before Sempowich's protected activity. See Sempowich Dep. [D.E. 48-1] 65–66; Rishe Dep. [D.E. 48-4] 68. During the remainder of February and into March, Tactile encouraged Sempowich to take the head and neck position and adjusted certain aspects of the position to meet Sempowich's demands. See Sempowich Dep. [D.E. 48-1] 74, 89–92; Mattys Dep. [D.E. 48-2] 47–55; [D.E. 63-18]; [D.E. 64-7] . Moreover, Sempowich was aware that Folkes provided a deadline of March 30, 2018, for her to accept the offer. See Sempowich Dep. [D.E. 48-1] 107–08. Sempowich does not point to any action of Tactile, from the day Rishe communicated the reassignment to her to the termination of her employment, that is causally connected to her complaints on February 22, 2018. See Nassar, 570 U.S. at 350; Guessous, 828 F.3d at 217; Huckelba, 2016 WL 6082032, at *3; cf. [D.E. 103] 35.

In opposition, Sempowich argues that the temporal proximity of complaint to termination, alone, is sufficient to demonstrate a causal connection. See [D.E. 103] 35. In support, she cites Foster v. University of Maryland-Eastern Shore, 787 F.3d 243, 248 (4th Cir. 2015), and King v. Rumsfeld, 328 F.3d 145, 151 & n.5 (4th Cir. 2003). See [D.E. 103] 35. Neither case, however, supports Sempowich. In Foster, the Fourth Circuit considered temporal proximity in the context of other facts that tended to show a causal connection. See Foster, 787 F.3d at 253 ("Taken together, this evidence is sufficient to create a jury question regarding the causation prong of the prima facie case." (emphasis added)). In King, the Fourth Circuit emphasized that plaintiff demonstrated causation "in the context of [the] particular employment situation"; specifically, in light of

43

defendant's ongoing performance reviews of plaintiff and the "natural decision point" for employment decisions coming at the end of the year. King, 328 F.3d at 151 n.5. In contrast, as discussed, Sempowich was on notice that Tactile reassigned the Mid-Atlantic region and had offered her the head and neck position before Sempowich complained. And Sempowich's employment with Tactile ended when she did not accept the reassignment. Thus, the record in case does not support an inference of causation based on temporal proximity alone. Accordingly, the court grants summary judgment to Tactile concerning Sempowich's Title VII retaliation claim.

3.

As for Sempowich's claim under the EPA, 29 U.S.C. § 206(d)(1) states:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). To demonstrate a prima facie case under the EPA, plaintiff must show: (1) the employer paid higher wages to an employee of the sex opposite of plaintiff; (2) the plaintiff and comparator employee performed work that required equal skill, effort, and responsibilities; and (3) plaintiff and comparator employee performed that work under similar working conditions. See Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974); Evans v. Int'l Paper Co., 936 F.3d 183, 196 (4th Cir. 2019); Spencer v. Virginia State Univ., 919 F.3d 199, 203 (4th Cir. 2019); U.S. Equal Emp. Opportunity Comm'n v. Maryland Ins. Admin., 879 F.3d 114, 120 (4th Cir. 2018); Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994). "This initial showing permits an inference that a pay disparity was based on sex discrimination," even if plaintiff cannot demonstrate the employer acted with discriminatory intent. Spencer, 919 F.3d at 203; see Maryland Ins. Admin., 879 F.3d at 120. If plaintiff demonstrates her prima facie case, the burden shifts to the employer to show that the pay differential "was based on a factor other than sex," and "that the proffered reason

44

did in fact explain the wage disparity, not merely that it could." Spencer, 919 F.3d at 203; see Maryland Ins. Admin., 879 F.3d at 120.

Both parties consider Seeling an appropriate comparator and focus only on Seeling. See [D.E. 103] 36; [D.E. 143] 27–30; [D.E. 137] 10. Thus, the court assumes without deciding that Seeling is a comparator for purposes of Sempowich's EPA claim and, accordingly, that Sempowich satisfies the second and third elements of her prima facie case. The court also assumes without deciding that Tactile is an employer under the EPA. See 29 U.S.C. § 203(d).

In seeking summary judgment, Tactile argues that Sempowich earned more than Seeling in total compensation (i.e., base salary plus commissions) in 2016 and 2017, and from 2015 to 2017. See [D.E. 143] 28–29. Thus, Tactile contends that Sempowich has failed to establish a prima facie case under the EPA. See id. Alternatively, Tactile argues that any difference from Seeling in amount paid to Sempowich was due to salary history of both, that Seeling was hired from another company while Sempowich was promoted from within, and Seeling had more sales experience than Sempowich at the time of hire. See id. at 29–31.

The EPA does not define "wages." The Equal Employment Opportunity Commission ("E.E.O.C"), however, has:

> Under the EPA, the term "wages" generally includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name.

29 C.F.R. § 1620.10. Several district courts have implicitly or explicitly adopted the E.E.O.C.'s definition. See Gallaher v. Kleinwort Benson Gov't Secs., Inc., 698 F. Supp. 1401, 1403–05 (N.D. Ill. 1988) (counting as "wages" plaintiff's base salary plus bonus); E.E.O.C. v. Altmeyer's Home Stores, Inc., 672 F. Supp. 201, 214 (W.D. Pa. 1987) (counting as "wages" plaintiff's "base salary and bonus, commission, and overrides"), as amended, 698 F. Supp. 594 (W.D. Pa. 1988).

45

This court applies the E.E.O.C.'s definition of "wages" to Sempowich's EPA claim. Not only does the E.E.O.C.'s definition of "wages" comport with the text of section 206(d)(1), it also comports with the Supreme Court and Fourth Circuit's recitation of the elements of an EPA claim. See Corning Glass Works, 417 U.S. at 195; Spencer, 919 F.3d at 203; Evans, 936 F.3d at 196; Maryland Ins. Admin., 879 F.3d at 120; Brinkley-Obu, 36 F.3d at 343. As applied, no rational jury could find that Tactile paid higher wages to Seeling than it did to Sempowich. From 2015 to 2017, Seeling made approximately $743,000 in base salary and commissions. Sempowich made approximately $806,000. See [D.E. 49] 13.[11]

In opposition, Sempowich argues that the court should ignore incentive compensation when comparing her wages to those of her comparator. See [D.E. 103] 37. Sempowich then cites Keziah v. W.M. Brown & Son, Inc., 888 F.2d 322, 325 (4th Cir. 1989), and argues that "[t]he Fourth Circuit and other courts have previously disregarded production-based incentives, such as sales commissions, when conducting an EPA analysis for sales personnel." [D.E. 103] 37. Sempowich asserts that holding otherwise "would frustrate the EPA's broad remedial purpose" by requiring harder work for commissioned employees with lower base salaries to achieve equal pay. See id.

Keziah is distinguishable. In Keziah, the employer asserted that the higher, set amount paid to a male employee was a draw on future commissions earned from sales the company expected that male employee to make. Thus, the employer argued that the female plaintiff's lower, set amount of wages, was due to the employer's lower expectations for her sales as compared to the male employee. Moreover, the employer asserted that the commission rate for both was the same. See Keziah, 888 F.2d at 324–25. In Keziah, the Fourth Circuit rejected the employer's claim and found

_____

[11] Sempowich disputes the amount of incentive stock options ("ISOs") and restricted stock units ("RSUs") that she and Seeling earned from 2015 to 2017. See [D.E. 104] ¶ 379. Sempowich concedes that Tactile granted both the same amount of RSUs in 2017. See id. Ultimately, the dispute is not material. See Hux, 451 F.3d at 315. Sempowich's objection disputes only compensation Tactile claims it paid her, and she does not assert that Seeling received any other form of compensation not accounted for in the court's calculations.

46

that both the female plaintiff's and male employee's salaries were guaranteed (i.e., the salaries were "base salaries"). See id. at 325. Furthermore, in Keziah, neither party presented evidence of amounts plaintiff or the male employee earned in addition to the set, base salaries. Accordingly, in Keziah, the Fourth Circuit did not draw the distinction on which Sempowich relies—specifically, that a court should consider base salary and commissions separately (or not at all) when determining "wages" under the EPA. The other cases Sempowich cites are not binding on this court and do not support Sempowich's argument. See Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 168–69, 176–77 (D. Mass. 2001); Meldrum v. RPM, Inc., No. 1:93-CV-756, 1994 U.S. Dist. LEXIS 10493, at *16–17 (W.D. Mich. June 3, 1994) (unpublished). Thus, even viewing the record in the light most favorable to Sempowich, Sempowich fails to demonstrate a prima facie claim under the EPA, and the court grants summary judgment to Tactile concerning Sempowich's EPA claim.

4.

Sempowich alleges a wrongful discharge claim against Tactile under North Carolina law. Under North Carolina law, an employer generally may terminate an at-will employee for any reason. Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999). North Carolina recognizes a narrow exception to that general rule if an employee's termination violates North Carolina public policy. See, e.g., Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion at 165 N.C. App. 32, 43–50, 598 S.E.2d 151, 159–63 (2004) (McCullough, J., dissenting)); Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416 S.E.2d 166, 167–70 (1992); Coman v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). To prove a claim of wrongful discharge in violation of North Carolina public policy, a plaintiff must identify and rely upon a specific North Carolina statute or North Carolina constitutional provision stating North Carolina's public policy. See Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–70; Coman, 325 N.C. at 176, 381 S.E.2d at 447; Horne v.

47

Cumberland Cty. Hosp. Sys., Inc., 228 N.C. App. 142, 146, 746 S.E.2d 13, 17–19 (2013); Gillis v. Montgomery Cty. Sheriff's Dep't, 191 N.C. App. 377, 379–81, 663 S.E.2d 447, 449–50 (2008); Whiting v. Wolfson Casing Corp., 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); Considine v. Compass Grp. USA, Inc., 145 N.C. App. 314, 321, 551 S.E.2d 179, 184, aff'd, 354 N.C. 568, 557 S.E.2d 528 (2001) (per curiam).

Sempowich relies on N.C. Gen. Stat. § 143-422.2 as the source of North Carolina's public policy.[12] Sempowich contends that Tactile terminated her employment because of her sex, because of her age, and in retaliation of complaints about sex discrimination.

Section 143-422.2 does not create a private right of action for retaliation or provide a source of public policy concerning retaliation. See, e.g., Whitt, 359 N.C. at 625, 614 S.E.2d at 532; McLean v. Patten Cmtys., Inc., 332 F.3d 714, 719 (4th Cir. 2003); Swann v. Source One Staffing Sols., 778 F. Supp. 2d 611, 622–23 (E.D.N.C. 2011); Haley v. Wal-Mart Stores E., L.P., No. 5:07-CV-219-D, 2008 WL 5069073, at *4 (E.D.N.C. Nov. 17, 2008) (unpublished); Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 544 (E.D.N.C. 2008); Efird v. Riley, 342 F. Supp. 2d 413, 428 (M.D.N.C. 2004); Stout v. Kimberly Clark Corp., 201 F. Supp. 2d 593, 607 (M.D.N.C. 2002); Bradley v. CMI Indus., Inc., 17 F. Supp. 2d 491, 499 (W.D.N.C. 1998). Accordingly, the court

---

[12] N.C. Gen. Stat. § 143-422.2 states:

(a) It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

(b) It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

48

grants summary judgment to Tactile to the extent Sempowich asserts a retaliation claim under North Carolina law.

As for Sempowich's wrongful discharge claim based on sex or age, it fails for the same reason that her Title VII claims fail. See Henson v. Liggett Grp., Inc., 61 F.3d 270, 277 (4th Cir. 1995); Coleman v. Altec, Inc., No. 5:16-CV-954-D, 2018 WL 4289610, at *7 (E.D.N.C. Sept. 7, 2018) (unpublished); Ricketts v. Logics, LLC, No. 5:15-CV-293-D, 2017 WL 4293406, at *8 (E.D.N.C. Sept. 27, 2017); Wood v. Town of Warsaw, 914 F. Supp. 2d 735, 744 (E.D.N.C. 2012); McDougal-Wilson, 427 F. Supp 2d at 621. No rational jury could find that Sempowich was terminated from her employment because of her sex or age. Accordingly, the court grants Tactile's summary judgment on Sempowich's wrongful discharge claim under North Carolina law.

## B.

Sempowich moved for partial summary judgment on certain Tactile defenses and to strike Tactile's response to Sempowich's statement of material facts concerning that motion. See [D.E. 34, 127]. In light of this court's conclusions about Tactile's motion for summary judgment, the court dismisses as moot both motions.

## IV.

In sum, the court the court GRANTS defendant's motion for summary judgment [D.E. 41], GRANTS defendant's motion to strike plaintiff expert Berry's report [D.E. 44], GRANTS plaintiff's motion for leave to file exhibits [D.E. 115], DENIES plaintiff's motions for sanctions or in the alternative to strike [D.E. 24], to exclude opinion testimony of defense expert Cowhey [D.E. 30], and to strike defendant's statement of material facts [D.E. 90], and DISMISSES as moot plaintiff's motion for partial summary judgment [D.E. 34] and motion to strike defendant's responsive statement of material facts [D.E. 127]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 23 day of October 2020.

JAMES C. DEVER III
United States District Judge